UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LANCE SHOCKLEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-01513-SRC |
| | ) | |
| RICHARD ADAMS et al., | ) | |
| | ) | |
| Respondents. | ) | |

**<u>Memorandum and Order</u>**

Five days before his scheduled execution for the murder of Missouri Highway Patrol Sergeant Carl "DeWayne" Graham, Jr., Petitioner Lance Shockley comes to this Court neither professing his innocence nor contesting his guilt.  After extensive litigation that has spanned decades and all levels of both the Missouri and federal court systems, Shockley no longer challenges his death sentence.  Instead, he now seeks an emergency stay of his execution on the novel theory that applicable law mandates that the state allow *his daughters* (as opposed to other ministers) variously to have a contact visit with him and be present with him in the execution chamber while his execution is carried out, so as to have them provide and perform religious sacraments and rituals.

Respondents claim that safety and security considerations, borne of their experience as corrections officials who have overseen several state-mandated executions, counsel strongly against allowing family members into the execution chamber.  They note the significant distinction between being an execution observer, who sits outside the execution chamber "on the other side of the glass," and being one of the few people actually permitted inside the tightly controlled and highly regulated confines of the execution chamber itself.  Respondents have

1

expressly agreed that Shockley's daughters are welcome to be execution observers. And, Respondents have offered various accommodations, including having a non-family minister of Shockley's own choosing provide and perform the exact same religious sacraments and rituals that Shockley desires.

Having presided over Shockley's federal habeas proceedings in this court, having issued a 165-page opinion thoroughly addressing each of Shockley's 28 federal habeas claims, and having reviewed the subsequent opinions issued by the Eighth Circuit, the Supreme Court of the United States, the Supreme Court of Missouri, and other Missouri courts in the two years following this Court's habeas opinion, including the Missouri Supreme Court's October 8, 2025 opinion denying Shockley's most-recent effort to stave off his execution, the Court is well informed of the history and background of these proceedings. And, having reviewed the myriad pleadings and exhibits submitted in the approximately 44 hours since Shockley filed this case seeking emergency injunctive relief, the Court trains its focus on the weighty issues at hand.

To level set, the focus here is whether Shockley satisfies the four factors a court must weigh before granting a stay of execution. *See Nken v. Holder*, 556 U.S. 418, 426 (2009); *Hill v. McDonough*, 547 U.S. 573, 584 (2006). The Court assesses Shockley's probability of success on the merits and finds it lacking. In so doing, it's important to emphasize that the focus here is on Shockley, and not on his daughters and the alleged harm they might suffer—they are not parties to this case, and Shockley appropriately does not purport to seek relief on their behalf.

## I.    Background

Given the time constraints and the need to allow for appellate review, the Court does not recite all facts here, but it has reviewed all facts and evidence in the record and now provides this background summary.

2

## A.    Procedural history

On October 9, 2025, Shockley filed a complaint in this Court under 42 U.S.C. § 1983. Doc. 1.  In his complaint, Shockley alleges that Respondents, several officials of the Missouri Department of Corrections, violated his rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc et seq., by preventing his daughters (but not others) from serving as his spiritual advisors leading up to his execution.  Doc. 1 at 11–18 (The Court cites to page numbers as assigned by CM/ECF.). Shockley then filed a motion for a preliminary injunction to stay his execution, doc. 2, which the parties have fully briefed, docs. 15, 19.  Next, Shockley filed a motion for leave to file certain exhibits under seal, doc. 5.  The following morning, Respondents filed their own motion for leave to seal, doc. 13, and a motion to dismiss Shockley's case for failure to state a claim, doc. 16.  The parties have fully briefed the motion to dismiss.  Docs. 20, 23.  Finally, Shockley filed a motion to proceed *in forma pauperis*.  Doc. 24.

## B.    Evidence regarding the execution chamber

No evidence in the record suggests that Missouri has allowed family members in the execution chamber during the execution process.  The undisputed evidence establishes that the state has allowed non-family spiritual advisors inside the execution room; that evidence further establishes a blemished history.  Of the seven most recent executions in Missouri, state officials have required those spiritual advisors to pledge, in writing, to maintain the confidentiality of what occurred in the execution chamber; of the seven, five—over 70%—have violated their written pledges.  Doc. 15-4 at 1.

No evidence in the record suggests that disruptions have occurred by having non-family spiritual advisors in the execution chamber.  Perhaps this is evidence that spiritual advisors are

3

not a disruptive group.  But in keeping with the notion that "a government need not wait for the flood before building the levee," *Ramirez v. Collier*, 595 U.S. 411, 444 n.2 (2022) (Kavanaugh, J., concurring), the Court finds that this record of non-disruption by non-family members is equally plausibly evidence that excluding family members is a sound practice, the veritable building of the levee before the flood.

The Court performed research in an effort to determine what history reveals about family members being present in the execution chamber, or in or at historical analogues of the present-day execution chamber.  In the limited time available to decide this case, the Court's brief research did not reveal historical traditions regarding family in the execution chamber.  No evidence in the record suggests that Shockley's daughters would be disruptive if permitted in the execution room.  *Cf. Dunn v. Smith*, 141 S. Ct. 725, 726 (2021) (Kagan, J., concurring) (noting the state had identified two examples of "disturbances" by close family members of inmates at executions).  However, common sense, *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), suggests that allowing family members in the execution chamber could create a literal flood of emotions and a veritable flood of danger:  emotional outbursts; physical struggles and attempts to interfere with the execution process; recognition of the faces, features, and voices of the officials charged with carrying out the execution; and later doxing, threatening, or harassing those officials.  The Missouri officials here fear as much.  *See* doc. 15-2 at 2–3; doc. 15-4 at 12 (noting that the "institutional safety and security risk presented by a spiritual advisor who is an immediate family member . . . is significantly higher. . . . This need not be based on intentional malfeasance.").

Regarding both contact visits with Shockley in the moments or hours before execution and presence in the execution chamber, the only evidence in the record reveals considerable risks of interference with the carefully managed execution process and situs.  *See* doc. 15-4 at 2 ("The

holding cell where an offender is held before being ultimately moved to the execution chamber on the day of their scheduled execution, as well as the execution chamber itself, are uniquely sensitive areas within a prison and are areas in which the institution's interest in safety and security is at the highest importance.  Contact visits in these areas, then, require the highest level of precautions to protect those interests.  These concerns are especially pronounced in the Missouri Department of Corrections where the holding cell is in close proximity to the execution chamber.  Further, members of the execution team may need access to that area in the time leading up to the scheduled execution."); doc. 15-2 at 3 ("Physical contact with family members imminently preceding an execution poses a significant institutional safety and security risk, even beyond the risk posed by contact with non-family members.  Physical contact can significantly interfere with the institution's duties in preventing interference with the execution; managing inmate behavior, including physical, psychological, and emotional behaviors; preventing the transfer of contraband; and protecting staff members and visitors.  There are any number of ways a family member could interfere with an impending execution, including through the introduction of various drugs which can act through skin-to-skin contact but are otherwise very difficult to screen for.  One could use physical contact to impact or otherwise alter the offender's vital signs and/or could attempt to delay the execution.  Even inadvertent action in the close quarters of the execution chamber can cause significant and dangerous results.  A stumble or fall while inside the chamber could dislodge or disrupt I.V. lines, restraints, or even pillows used for the offender's comfort.  These inadvertent actions become all the more likely when the individual inside the execution chamber has an even closer relationship with the offender, such as a father-daughter relationship.  The significant emotions involved in an execution warrant even additional precautions, especially if an offender's family member was given direct and

ample opportunity to interfere with the carrying out of the execution, the solemnity and decorum of the execution chamber, prison officials' responses during any potential emergency, etc.  Here, the applicants are Lance Shockley's own daughters.  This intimate connection, along with the intense emotions surrounding an execution, have an even greater potential to exacerbate the psychological distress for all involved, which, in turn, could lead to even more volatile reactions.").

For its part, the Court finds itself wholly unqualified to micromanage, much less manage, the execution chamber and situs.  *Ramirez*, 595 U.S. at 445 (Kavanaugh, J., concurring).  The Court finds that experienced corrections officials have far greater qualifications and experience in making those decisions.  The Court has reviewed the declarations of the corrections officials here, who collectively have over 50 years of experience in corrections:  the Director of the Missouri Department of Corrections, who has served the Department for nearly 15 years (doc. 15-4), the Division Director of the Division of Adult Institutions within the Missouri Department of Corrections, who has served the Department for over 16 years (doc. 15-2), and the Warden of the Potosi Correctional Center, who has served the Department  for more than 20 years (doc. 15-3).  Mindful that the Court must *not* "simply defer to their determination[s]," *Ramirez*, 595 U.S. at 429, the Court does find it appropriate to accord a degree of respect to their judgment, particularly when they and their legal team have meaningfully engaged in dialogue with Shockley to find reasonable accommodations of his requests.

The Court also remains mindful that an injunction mandating family-member presence in the execution room—something wholly against the judgment of these experienced corrections officials—could have disastrous consequences.  Indeed, hope is not a strategy.  The Court likewise takes quite seriously that "the government has a compelling interest in preventing

disruptions of any sort and maintaining solemnity and decorum in the execution chamber." *Ramirez*, 595 U.S. at 429.  The Court thus finds it appropriate to tread gingerly in such a delicate matter rather than to wield its considerable equitable powers with the hubristic confidence of a modern-day philosopher king.

## II.    Standard

### A.    Preliminary injunction

When examining whether to grant a preliminary injunction, the Court should examine: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see also Nken*, 556 U.S. at 426.  Additionally, because Shockley seeks equitable relief to stay his execution, the Court must "apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill*, 547 U.S. at 584 (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004)); *see also Nooner v. Norris*, 491 F.3d 804, 808 (8th Cir. 2007).  A stay of execution "is an equitable remedy" which is "not available as a matter of right." *Hill*, 547 U.S. at 584.  And equity "must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.*

Shockley has not requested a hearing on his motion for preliminary injunction.  The Court finds that the parties have had the opportunity to adequately develop the factual record on the motion for preliminary injunction, and the Court determines the motion on the briefs and evidence in the record without hearing.  *See* Fed. R. Civ. P. 78(b); *United Healthcare Ins. Co. v.*

*AdvancePCS*, 316 F.3d 737, 744 (8th Cir. 2002) ("An evidentiary hearing is required prior to issuing a preliminary injunction only when a material factual controversy exists." (citing *Movie Sys., Inc. v. MAD Minneapolis Audio Distribs.*, 717 F.2d 427, 432 (8th Cir. 1983)); *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (affirming district court's denial, without a hearing, of plaintiff's motion for preliminary injunction); 11A *Wright & Miller's Federal Practice & Procedure* § 2949 (3d ed. 2025).

### B.    The Free Exercise Clause and RLUIPA

"The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting the free exercise' of religion." *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021) (ellipses in original) (quoting U.S. Const. amend. I).  The Supreme Court held in *Employment Division, Department of Human Resources v. Smith* that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Id.* at 533 (citing 494 U.S. 872, 878–82 (1990)).  The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.*  And a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* (cleaned up).  "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.  "A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny"—strict scrutiny—and can only survive if it "advance[s] interests of the highest order"

and is "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye*, *Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (citation modified); *see also Fulton*, 593 U.S. at 541.

RLUIPA aims to ensure "greater protection for religious exercise than is available under the First Amendment." *Ramirez*, 595 U.S. at 424. The act provides that "no government shall impose a *substantial burden* on the religious exercise of a person residing in or confined to an institution—including state prisoners—even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Ramirez*, 595 U.S. at 424–25 (emphasis added) (cleaned up) (citing 42 U.S.C. § 2000cc-1(a)). Although RLUIPA protects "any exercise of religion, . . . a prisoner's requested accommodation must be sincerely based on a religious belief." *Id.* at 425 (citation modified). And to emphasize, the "burden on the prisoner's religious exercise must . . . be substantial." *Id.* (cleaned up).

"Under the Free Exercise Clause [and] RLUIPA," a petitioner "must first raise . . . fact[s] regarding whether [a prison] has placed a substantial burden on his ability to practice his religion." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). Government action substantially burdens religion when it "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a person's individual religious beliefs; . . . meaningfully curtail[s] a person's ability to express adherence to his or her faith; or . . . den[ies] a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Id.* Importantly, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the

Free Exercise Clause of the First Amendment as well." *Van Wyhe v. Reisch*, 581 F.3d 639, 657–58 (8th Cir. 2009).

## III.   Discussion

The Court considers below Shockley's motion for preliminary injunction, doc. 2, his motion to file under seal, doc. 5, and his motion to proceed *in forma pauperis*, doc. 24. The Court also addresses Respondents' motion to file under seal, doc. 13.

### A.   Motion for preliminary injunction and stay of execution

As explained above, to obtain an injunction staying his execution, Shockley must first show that he is likely to succeed on the merits of his claims. *Hill*, 547 U.S. at 584; *Nooner*, 491 F.3d at 804. Because the Court finds that Shockley fails to show a likelihood of success on his RLUIPA and First Amendment claims, the Court denies Shockley's motion for a preliminary injunction and stay of execution. Doc. 2.

#### 1.   Likelihood of success on the merits

As noted above, a plaintiff bringing a RLUIPA claim "bears the initial burden of proving that a prison policy 'implicates his religious exercise.'" *Ramirez*, 595 U.S. at 425. And "[a]lthough RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,' . . . a prisoner's requested accommodation 'must be sincerely based on a religious belief and not some other motivation." *Id.* Crucially, the burden on the prisoner's religious exercise must be substantial. *Id.*; *see also* 42 U.S.C. § 2000cc-1(a). Only then does the burden shift to the government to prove that the burden imposed is the least restrictive means of furthering a compelling government interest. *Ramirez*, 595 U.S. at 425; 42 U.S.C. § 2000cc-1(a).

Governments substantially burden religion when they "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; . . . meaningfully curtail a person's ability to express adherence to his or her faith; or . . . deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Patel*, 515 F.3d at 813. And while a "prison must permit a reasonable opportunity for an inmate to engage in religious activities," it "need not provide unlimited opportunities." *Van Wyhe*, 581 F.3d at 657.

The Eighth Circuit has found, for example, that a prison giving inmates three hours per week for group worship—instead of the requested four—did not substantially burden their religious exercise. *See Weir v. Nix*, 114 F.3d 817, 821 (8th Cir. 1997). Additionally, a prison did not substantially burden an inmate's religious exercise when it denied him the ability to keep prayer oils in his cell, especially when the prison's denial was premised on security concerns. *See Hodgson v. Fabian*, 378 F. App'x 592, 593 (8th Cir. 2010). On the other hand, when a prison denied a prisoner's requested meal accommodation in observance of the Sabbath, the prison substantially burdened the prisoner's right to freely exercise his religion. *Love v. Reed*, 216 F.3d 682, 689–90 (8th Cir. 2000).

Here, Shockley does not show that the burden placed on him by Respondents' refusal to allow his daughters to serve as his spiritual advisors *in and proximately surrounding the execution chamber* is substantial. Shockley states in his complaint that he wants his daughter Summer to administer communion to him and anoint him with oil shortly before his execution, and that he wants his daughter Morgan to touch and pray over him during his execution. Doc. 1 at 1. Shockley then argues that the "prohibition on Summer Shockley and Morgan Shockley as spiritual advisors at the time of Mr. Shockley's execution substantially burdens Mr. Shockley's

11

exercise of his sincerely held religious beliefs, which include having his spiritual advisors praying with him and watching over him as he passes to the afterlife." Doc. 1 at 16.

But the facts in this case show that Shockley has been afforded meaningful opportunities to exercise his religion in the days leading up to his execution, like the prisoners in *Weir* and *Hodgson*, and will be afforded the opportunities he requests in and proximately surrounding the execution chamber. First, while the Department stated that, due to security concerns, Shockley cannot have a contact visit with his daughters to receive communion and anointing before his execution, the Department also offered Shockley several alternative accommodations so that he could still exercise his religion. These alternative accommodations included:

> (1) Department clergy [providing] the communion materials and anointing oil to Mr. Shockley for his own, personal administration;
>
> (2) the Department [allowing] Department clergy (of Mr. Shockley's choosing) to administer the communion materials and anointing oil;
>
> (3) the Department [allowing] Mr. Shockley to designate a spiritual advisor *who is not related to Mr. Shockley*, to have a contact visit and administer the communion materials and anointing oil; or
>
> (4) the Department [allowing] one of Mr. Shockley's attorneys to administer the communion materials and anointing oil.

Doc. 2-13 at 1. And, for each of these four options, the Department noted that "Mr. Shockley's daughters may be present on the non-contact side of the visiting area, and they would be permitted to lead the spiritual ritual/proceeding and to provide direction to the person on the contact side of the visiting area." *Id.* The Department would therefore allow Shockley both to engage in his chosen religious activity and to have his daughters participate in the activity with him.

Nowhere in the record before this Court does Shockley indicate that Morgan and Summer are the only acceptable spiritual advisors to him. Nor does he indicate that Morgan and Summer are the only members of his faith capable of administering communion to him or anointing him

with oil consistent with his religious beliefs.  Indeed, he nowhere asserts any particular religious

or spiritual-advisor connection to them, and nothing in the record before the Court, or apparently

before the Department, establishes *when* Morgan became a minister, *see* doc. 2-2 (undated letter

from church), while the record shows that Summer became a minister last year, *see* doc. 2-3. The

Court will assume for purposes of this motion that Shockley has a particular spiritual-advisor

connection to them, but the timing of when they became ministers goes to whether this last-

minute litigation falls into the category of abusive litigation.  *See Ramirez*, 595 U.S. at 451–52

("Prisoners engage in abusive litigation in several different ways.  For instance, some prisoners

hold off bringing new claims until the last minute in order to force courts to stay or enjoin an

execution simply to afford themselves more time to consider the merits of the claims." (first

citing *Woodard v. Hutchins*, 464 U.S. 377, 377–80 (1984) (Powell, J., concurring); then citing

*Bucklew v. Precythe*, 587 U.S. 119, 149–50 (2019); then citing *Price v. Dunn*, 587 U.S. 1008,

1008–09 (2019) (Thomas, J., concurring); and then citing *Dunn v. Ray*, 586 U.S. 1138, 1138

(2019))); *see also id.* ("Other prisoners bring any 'meritless' claim available, no matter how

frivolous, in hopes a sympathetic court will grant relief." (first citing *Ray*, 586 U.S. at 1138; then

citing *Hill*, 547 U.S. at 584–85; and then citing *Lambert v. Barrett*, 159 U.S. 660, 662 (1895)));

*id.* at 451–52 ("Still others litigate their claims 'piecemeal[,] . . . challenging one aspect' of their

execution 'after another' in order to buy time." (first quoting *Hill,* 547 U.S. at 581; then citing

*Woodard*, 464 U.S. at 380 (Powell, J., concurring); then citing *Williams v. Kelley*, 854 F.3d 998,

1002 (8th Cir. 2017) (per curiam); and then citing *Sanders v. United States*, 373 U.S. 1, 18

(1963))); *id.* at 452 ("And, in many other ways, yet more prisoners 'deliberately engage in

dilatory tactics' designed to drag execution-delaying claims out 'indefinitely.'" (first quoting

*Rhines v. Weber*, 544 U.S. 269, 277–78 (2005); and then citing *Ryan v. Valencia Gonzales*, 568

U.S. 57, 76–77 (2013))).  Such abusive tactics "all too often succeed."  *Id.* (citing *Bucklew*, 587 U.S. at 149–50).  At a minimum, the record establishes that Shockley could have brought this action much sooner than he did.  *See Hill*, 547 U.S. at 584 (quoting *Nelson*, 541 U.S. at 650); *see also Nooner*, 491 F.3d at 808.

The Court also recognizes, as Shockley posits, that ministers are not fungible, doc. 20 at 2.  But the First Amendment and RLUIPA do not mandate the elimination of any and all burdens to the free exercise of religion, only those that are substantial.  *Ramirez*, 595 U.S. at 425; *Van Wyhe*, 581 F.3d at 657.  And context is important.  This isn't the mine run of accommodations in the prison setting; the specific context here is the state's compelling interest in maintaining the "safety, security, and solemnity" of the execution room.  *Ramirez*, 595 U.S. at 443 (Kavanaugh, J., concurring).

For all of these reasons, the Court finds that the Department's accommodation of allowing Shockley to "designate a spiritual advisor *who is not related to Mr. Shockley*" to administer communion and anointing, doc. 2-13 at 1 (emphasis in original), does not substantially inhibit or constrain Shockley's conduct or expression of his religious beliefs.  *Patel*, 515 F.3d at 813.  Nor does it prevent him from expressing adherence to his faith.  *See id.*  Nor, still, does it deny him the ability to engage in his preferred religious activities.  *See id.*  Thus, the Department's decision does not constitute a "substantial burden" on Shockley's free exercise of religion under RLUIPA.  *See id.*

Second, while the Department denied Shockley the ability to have his daughter Morgan pray over him in the execution chamber due to safety concerns, doc. 7-1 at 3, it did not deny Shockley the ability to have *any* spiritual advisor of his faith in the execution chamber with him. Indeed, in Warden Adams's October 6, 2025 decision regarding Shockley's requested spiritual

accommodations, Adams specifically states that he denied Shockley's request "without prejudice to Mr. Shockley's selection of a different spiritual advisor who is not Mr. Shockley's family member." *Id.* Thus, Shockley still retains the ability to have a spiritual advisor of his faith, and (subject to safety concerns) of his choosing, in the execution chamber with him to lay hands on him and pray over him. That Morgan Shockley may not be the one in the chamber with him does not constitute a substantial burden on his religious exercise, considering all attendant factors and accommodations. *See Patel*, 515 F.3d at 813.

And, Respondents' actions here do not substantially burden religion because they do not "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; . . . meaningfully curtail a person's ability to express adherence to his or her faith; or . . . deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Patel*, 515 F.3d at 813. With the accommodations offered, Shockley may engage in *all of the religious activities* he has requested.

And third, while the Department denied Shockley's request to have Morgan present in the execution chamber, it has allowed Morgan and Summer to serve as witnesses to Shockley's execution. *See* doc. 7-1 at 3; doc. 7-2. Shockley therefore retains the opportunity to have Morgan and Summer "pray with" and "watch[] over" him as he passes into the afterlife, doc. 1 at 16. For these reasons as well, Shockley has not shown a substantial burden. *Patel*, 515 F.3d at 813. Again, Shockley may still engage in all of the *activities* he has requested.

In finding that the accommodations Respondents have offered do not substantially burden Shockley's free exercise of religion, the Court also emphasizes what's not in the record:

- Shockley does not assert that his daughters are his only spiritual advisors;

- Shockley does not assert that his daughters are the only ministers able or qualified to provide the religious sacraments and rituals he seeks;

- Shockley does not articulate how the accommodations substantially burden, or burden at all, his exercise of religion.  Instead, he leaves it to be assumed;

- Shockley nowhere claims that he has a particularly unique spiritual bond with his daughters.  Again, he leaves it to be assumed.

The record Shockley chose to develop here leaves the Court with only a slender reed on which to determine the question of whether Shockley has met his burden under RLUIPA and the First Amendment to show that the accommodations offered by Respondents substantially burden his free exercise of religion.  Recognizing that spiritual advisors may not be fungible, doc. 20 at 2, Shockley has known of this issue for months and chose to file suit five days before his execution, so in this regard, the Court finds that Shockley's delay and lack of development of the record are equitable considerations weighing against the extraordinary equitable relief of a stay of execution.  *Hill*, 547 U.S. at 584; *Bucklew*, 587 U.S. at 149–51; *see also Ramirez*, 595 U.S. at 450 (Thomas, J., dissenting).

And to the extent Shockley argues that *Ramirez* entitles him to have Morgan and Summer as his spiritual advisors despite the Department's safety concerns, *Ramirez* does not extend so far.  In that case, Texas initially denied Ramirez the opportunity to have *any* spiritual advisor pray over him or lay hands on him during his execution.  *Ramirez*, 595 U.S. at 419–20.  In finding that these actions were "traditional forms of religious exercise," *id.* at 425, the Supreme Court ultimately held that Ramirez had a likelihood of success on his section 1983 RLUIPA claim and that he was entitled to a preliminary injunction, *id.* at 433.  Here, unlike in *Ramirez*, Shockley was never denied the ability to have a spiritual advisor "lay hands on him and pray

over him while the execution [is] taking place." *Id.* at 419–20 (citation modified); *see* doc. 7-1 at 3. Instead, what Shockley was denied was the ability to have his *family members qua* spiritual advisors perform these actions, which *Ramirez* does not contemplate. The Court declines Shockley's invitation to extend *Ramirez* beyond its holding.

Thus, the Court finds that Shockley fails to satisfy his burden under RLUIPA. And "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe*, 581 F.3d at 657–58. Having found this, the Court addresses related issues on whether to grant an injunction staying execution.

### 2.    Unnecessary delay

A stay of execution is an extraordinary remedy. *See Hill*, 547 U.S. at 584. And the Court "should police carefully" abusive capital litigation. *Bucklew*, 587 U.S. at 150 . Having presided over Shockley's federal proceedings for many years, the Court has found that Shockley indeed has attempted to delay these proceedings, and even that his lawyers violated Rule 11 of the Federal Rules of Civil Procedure and various rules of professional conduct. *Shockley v. Crews*, 696 F. Supp. 3d 589, 620 (E.D. Mo. 2023) (finding that "Shockley has intentionally delayed this Court's proceedings"); Show Cause Order at 1, *Shockley v. Crews*, 4:19-cv-02520-SRC (E.D. Mo. Sept. 29, 2023), doc. 76; Order, *Shockley v. Crews*, 4:19-cv-02520-SRC (E.D. Mo. Feb. 10, 2024), doc. 101 (sanctioning Shockley's counsel). The Supreme Court of Missouri similarly has found that Shockley has delayed the proceedings. Order at 2, 5–6, *State of Missouri v. Shockley*, No. SC90286 (Mo. Oct. 8, 2025).

In this regard, the Court likewise notes that it found, and Shockley did not meaningfully contest, that in his over 820 pages of habeas briefing "Shockley does not argue that he is actually

innocent."  696 F. Supp. 3d at 631.  And Shockley conceded as much in his filings with the Eighth Circuit.  *See* Appellant Lance Shockley's Reply in Support of His Application for Certificate of Appealability at 6, *Shockley v. Crews*, No. 24-1024 ("While the District Court pointed out that Shockley never "proclaim[ed] his innocence or contes[ed] his guilt," . . . Shockley does not have to in order to show he is entitled to relief.").

Yet, much to the dismay of this Court, Shockley has since argued to the state courts that "he has always maintained his innocence."  *See* Lance Shockley's Amended Motion for Post-Conviction DNA Testing at 1, *State of Missouri v. Shockley*, No. 05C2-CR00080-01 (Carter Cnty. Cir. Ct. June 13, 2025) ("Shockley has, since his arrest, maintained that he did not kill Sgt. Graham."); Appellant's Brief at 10, *State of Missouri v. Shockley*, No. SD39099 (Mo. Ct. App. Sept. 22, 2025) ("Shockley has always maintained that he did not kill Sergeant Carl 'Dewayne' Graham."); Appellant Lance Shockley's Motion to Expedite the Appeal at 3, *State of Missouri v. Shockley*, No. SD39099 (Mo. Ct. App. Sept. 26, 2025) ("Shockley has always maintained that he did not kill Sergeant Graham."); Appellant Lance Shockley's Motion for Stay of Execution at 4, *State of Missouri v. Shockley*, No. SC90286 (Mo. Oct. 1, 2025) ("Shockley has always maintained that he did not kill Sgt. Graham.").

The Court does not here question the sincerity of Shockley's religious beliefs, so why point out Shockley's inconsistent (and that's being mild) representations to various courts? Because the Court *does* question Shockley's *motivations* for pursuing last-minute, and last-ditch, litigation seeking to stay his execution.  *See Ramirez*, 595 U.S. at 451 (Thomas, J., dissenting) ("Unsurprisingly, death-row inmates generally employ any means available to stave off their sentences and therefore often engage in abusive litigation." (citing *Woodard*, 464 U.S. at 380)). And the Court notes that the record establishes that Shockley could have brought this action

18

much earlier but chose to wait to bring it until after he made other last-ditch attempts to stay his execution. *See* Order, *State of Missouri v. Shockley*, No. SC90286 (Mo. Oct. 8, 2025).

### B.    Strict scrutiny

Because the Court finds that Shockley fails to meet his burden of demonstrating a substantial burden on his exercise of religion, the Court need not go any further. But mindful of the timeline and ultimate consequences at hand, the Court addresses whether the respondents' actions would satisfy strict scrutiny. The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533 (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 636–40 (2018)). And a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* (cleaned up). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.

Applying these principles, Respondents' actions survive strict scrutiny. Respondents would keep family out of the execution chamber regardless of whether they are religious ministers or otherwise performing religious rituals or sacraments; instead, it is the immutable characteristic of genetics that causes Respondents' safety and security concerns. Respondents have offered accommodations that allow the exact same rituals and sacraments to be performed both in the execution chamber, and in the time before Shockley is in the chamber (i.e., receipt of communion, bathing with ritual oils) as would be performed by Shockley's daughters. Respondents' proposed accommodations demonstrate not hostility towards religion but appropriate respect for it, and they strike a constitutionally permissible balance between

19

Shockley's First Amendment and RLUIPA rights and the government's "compelling interest in preventing disruptions of any sort and maintaining solemnity and decorum in the execution chamber." *Ramirez*, 595 U.S. at 430.

And while RLUIPA may require a claimant-specific strict-scrutiny analysis when that claimant's proposed religious request would not meaningfully undercut the government's interest, *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006),[1] an execution-chamber situation, as here, concerns a very different risk calculus. "[P]risons have compelling interests in both protecting those attending an execution and preventing them from interfering with it." *Ramirez*, 595 U.S. at 431. Unruly family members may "tamper with the prisoner's restraints or yank out an IV line," or even enable an inmate to "escape his restraints . . . or become violent." *Id.* Because of that, the "need for uniformity precludes" granting Shockley's request here. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. at 436.

### C.    Motion to dismiss

The Court now addresses Respondents' motion to dismiss. Doc. 16. Because the Court finds that Shockley does not meet the elements for a stay of execution and denies all relief he seeks on that ground, the Court denies Respondents' motion to dismiss as moot. Doc. 16.

### D.    Motion to proceed *in forma pauperis*

Finally, the Court addresses Shockley's motion to proceed *in forma pauperis*. Doc. 24. Given that Shockley's counsel has already paid the filing fee in this case, *see* doc. 24 at 2, and

---

[1] Although *O Centro* centers on the Religious Freedom Restoration Act (RFRA), "the Religious Land Use and Institutionalized Persons Act of 2000 . . . allows federal and state prisoners to seek religious accommodations pursuant to the *same standard as set forth in RFRA.*" *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. at 436 (emphasis added); *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) ("RLUIPA thus allows prisoners to seek religious accommodations pursuant to the same standard as set forth in RFRA.").

given that Shockley has not filed an inmate-account statement as required by 28 U.S.C.

§ 1915(a)(2), the Court denies Shockley's motion to proceed *in forma pauperis*.  Doc. 24.

## IV.    Conclusion

The Court concludes that Shockley has not met his burden under RLUIPA and the First Amendment to show that the accommodations offered by Respondents substantially burden his free exercise of religion.  The Court therefore finds that Shockley cannot prevail on the merits, and the Court thus need not address the other factors for granting the extraordinarily rare remedy of a stay of execution or, for that matter, an injunction mandating that family members be allowed in the execution chamber rather than as execution observers.  The Court denies Shockley's [2] motion for preliminary injunction, finds no issues on which to provide declaratory relief, dismisses this case with prejudice, and denies as moot Respondents' [16] motion to dismiss.  The Court denies Shockley's [24] motion to proceed *in forma pauperis*.

The Court also finds that the parties have met the legal and factual requirements for sealing various internal Department documents that are shielded from disclosure by Missouri law and therefore grants the [5] [13] motions for leave to file under seal.  The Court therefore orders that exhibits 7-1, 7-2, 7-3, 7-4, 7-5, and 14-1 will remain under seal.

So ordered this 11th day of October 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE